MEMORANDUM OF DECISION
On December 9, 1997, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of parental rights of Lorraine A. to her three children, Tina, Blake and Amanda. The children are now nine, six and four years of age respectively. The biological fathers of Tina and Amanda are unknown. The petition concerning Blake seeks the termination of the parental rights of the two putative biological fathers. Heath T. and Antonio H. The children's. mother, Lorraine A., has had ongoing mental health and drug use problems which led to the placement of Tina, her oldest child, with DCF on four occasions and for the younger two children on three occasions. Because it appeared to DCF that Lorraine had the capacity to improve her parenting and to provide for these children, they were returned to her after each removal, in the hopes that she could parent them. Unfortunately, Lorraine was never able to do so adequately. The children were last removed from their mother on January 30, 1996 and have been in foster care since that time.
At trial DCF proceeded pursuant to Connecticut General Statutes § 17a-112(c)(3)(B), alleging that Lorraine had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of her children, she could assume a responsible position in their lives. Other grounds had been alleged, but were CT Page 2786 abandoned. As to the putative fathers of Blake, DCF alleged that each had abandoned this child and that neither had an on-going parent child relationship with him. On the first day of trial, January 11, 1999, Lorraine A. filed a motion for dismissal, contending that DCF has not complied with the court order of May 19, 1998, permitting Lorraine to have therapeutic visitation with her children. The motion also requested in the alternative that the matter be continued to permit further visitation and for DCF to fulfill its obligations pursuant to the court's order. The motion was consolidated with the termination petitions for trial. The trial concluded on January 15, 1999. As set forth below, the court grants the termination petitions as to Lorraine A. and the putative biological fathers of Blake A. and denies the motion for dismissal and/or continuance.
1. PRELIMINARY MATTERS
 Failure to Provide Legally Adequate Notice to the Unknown Biological Fathers of Tina A. and Amanda A.:
The biological fathers of Tina A. and Amanda A. are unknown, although Lorraine A. has made statements that one of the named fathers of Blake, Heath T., may be the father of Amanda. Lorraine has been uncommunicative and hostile to DCF and its involvement in her life and there is not a great deal of information about the circumstances of her life during the time either of these children was conceived. No one claiming to be the father of either Tina or Amanda has come forward during the pendency of this matter. No individual has been involved with Lorraine over an extended period of time, who has acted in the role of a parent to these children. Further, there was no publication of notice of the proceedings to either Heath T. or the unknown fathers, using the customary appellation of "John Doe." Under the circumstances of this case, the court concludes that notice to the unknown biological fathers is legally defective.
The United States Supreme Court has held that parents possess a fundamental liberty interest in their children and that "(w)hen the State moves to destroy the weakened familial bond, it must provide the parents with fundamentally fair procedures." Santoskyv. Kramer, 455 U.S. 745, 754 (1982). Many years prior to its holding in the termination of parental rights context, the United States Supreme Court in Mullane v. Central Hanover Bank TrustCo., 339 U.S. 306, 314 (1949) held that the constitutional requirement that no person be deprived of due process of law was CT Page 2787 violated where a person was given only newspaper publication notice of proceedings against him, unless that person could not be located after the exercise of reasonable diligence. The court stated:
 "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."
The Mullane court noted the difficulties inherent with notice by publication. Nonetheless, it held:
 "This court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in cases of persons missing or unknown, employment of an indirect and even probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." Mullane atp. 317, internal citations omitted.
As to the detailed procedure to be followed, the court approves of the reasoning set forth in Bank Mart v. Langley,39 Conn. Sup. 198, 201, 202, 474 A.2d 491 (1984) where the court stated:
 "Nevertheless, if notice by publication is to be utilized, the plaintiff must clearly and in detail set forth in affidavit form all the steps taken to determine whether notice in some other form could be given so that the court may make an independent determination of the adequacy of the notice."
In this case, notice by publication would have been proper, but this important step was not performed. Based on the due process protections to which the unknown biological fathers, of Tina and Amanda are entitled, the court continues the case as to them to permit such publication and schedules a brief hearing on April 8, 1999 to make such further findings as may be required.
2. FACTS
The court has heard testimony from the DCF social workers, CT Page 2788 two psychologist evaluators, the foster parents of the children, the director of a substance abuse treatment agency who completed a drug evaluation of the mother, a community parent educator, a detective from the New Haven police department who investigated allegations of possible sexual abuse of Tina by Terry H. and Lorraine, the therapists who conducted therapeutic supervised visits with Lorraine and the three children in two separate programs, and from the mother herself. The court received many exhibits including transcripts of the orders entered on May 19, 1998 by the court, transcripts of the previous court testimony of another psychologist evaluator as well as Lorraine's mental health therapist, who treated her for a period of time in 1997. The evidence offered at trial, as interpreted in the light of the prior record in this court concerning Tina, Blake and Amanda, and judicial notice taken of all prior court actions, supports the following findings of fact:
Lorraine has had a history of mental health problems of varying severity since her adolescence, which have been compounded by her use of cocaine. She is herself a child who was placed in foster care when she was six, after her mother died. For her, the child protection system failed in its promise to protect and nurture children, as she was abused and neglected in the foster home in which she was placed. Her mental health and other adjustment difficulties led her to a brief placement with relatives, which disrupted in part due to her acting-out and then to residential placement until she reached the age of majority. It is a background of disruption and gross parenting failures, which ill prepared and equipped her for parenting when she became a mother herself. Indeed, some of the professionals evaluating her see the intergenerational difficulties as having significant impact on Lorraine's life and the lives of her three children.
A. History of Previous DCF Involvement with Lorraine A.
DCF first became involved with Lorraine and Tina in 1990, when Tina was just four months old. The first referral came on March 8, 1990 from the Department of Human Resources, reporting that Lorraine would not admit the Visiting Nurse Association in to her apartment. The information was that Lorraine was severely depressed, there was suspected drug use and the child was at risk of neglect, which was confirmed by DCF. On March 23, 1990, DCF received a second referral from the New Haven Police, stating that Lorraine left her four month old in her apartment to go to a local neighborhood store. Not only was the child unattended, but CT Page 2789 Lorraine left a pot on the stove cooking and the authorities located drug paraphernalia in the apartment. Tina was briefly removed from her mother and then subsequently returned to her mother's care under protective supervision for six months on April 4, 1990. Protective supervision was vacated on September 20, 1990. At that time, Lorraine appeared to be cooperating with the services offered to assist her.
That Lorraine's problems had not been addressed adequately was shown by the next referral on November 19, 1991 when the New Haven police called to say that Lorraine had left her daughter with a neighbor, saying she was going to the store for ten minutes when she did not then return for twelve hours. A fourth referral was received from the police on December 2, 1991 that Tina was wandering the halls of the apartment building unsupervised and that the apartment was roach-infested. Lorraine was not cooperative with DCF about this referral and DCF was unable to confirm these allegations.
The following year, on September 3, 1992, DCF again sought and secured an order of temporary custody and filed a neglect petition. At that time, Lorraine had left Tina with Lorraine's sister, allegedly to purchase some drugs and had not returned for some time, even though she stated she was only leaving the child for a short time. Her sister contacted DCF. After the child spent few days in the care of her aunt, she was returned to the daily care of her mother, who was involved in a drug evaluation and available to care for her. On October 28, 1992, Tina was adjudicated neglected, but remained with her mother under protective supervision. While Tina was still under protective supervision, on January 26, 1993, DCF received an anonymous referral that Lorraine was spending state money and selling food stamps for drugs. Upon investigation, DCF determined that there was no food in the house and that Tina was at risk of neglect. Despite this referral, the order of protective supervision under which Tina had been returned home was vacated in early 1993.
Just a month after protective supervision ended, on April 24, 1993, the police made another referral, that Lorraine had left the children at home alone. Blake had then been born on February 27, 1993 and was not quite two months old. Lorraine's response during the investigation was that she had left the children home with a male friend to go shopping, but she had no packages and did not remember the name of the friend. Again risk of neglect was confirmed, services offered which Lorraine refused, but DCF CT Page 2790 took no further action.
On November 27, 1993, DCF received the next referral from a friend of Lorraine's that Lorraine was using crack cocaine and that she was walking the streets with the children in the cold. DCF found the apartment filthy with roaches and mice and again confirmed risk of neglect. Again services were offered, which were refused by Lorraine, but no further action was taken on behalf of the children. On January 27 and January 28, 1994, the same acquaintance of Lorraine's twice reported that Lorraine was using drugs. There was no food in the house, no furnishings and the apartment remained infested with mice and roaches. At this point in time, DCF made its third at-risk of neglect finding in less than a year. A few days later, on February 2, 1994, the New Haven police again made a referral to DCF that Lorraine had yelled profanity and threats at Tina, then four years old. When the police investigated, the children appeared fine. By now, Lorraine was approximately six months pregnant with Amanda, who was born on April 26, 1994.
By June 22, 1994, Lorraine was again unable to cope with her family situation. A referral was received that day from a worker at St. Raphael's that Lorraine had been erratic in the substance abuse treatment program there and that she stated that she was unable to care for her children. Later that day, she returned to the emergency room and told a worker that she could not return home due to demons she said she saw there. DFC invoked its ninety-six hour hold and the children were all placed in foster care. The treatment providers believed her to be suffering from a brief reactive psychosis, secondary to stress. She was provided with two psychotropic medications for anxiety and then discharged. Upon her discharge from the hospital, all three children were returned to her. Although the plan was for Lorraine to continue to take her medication, she discontinued the use of Cogentin and Trilathon after only two months, stating that she did not need the medications. In order to support Lorraine and the children in the home, DCF provided services to the home which included mental health services and intensive case management services from the New Haven Family Alliance. No neglect petitions were filed during this time.
The next referral came six months later on December 30, 1994 that Tina had slapped Amanda. Another at-risk-of-neglect determination was made by DCF. Less than two months later on February 2, 1995, the New Haven police called again. Tina, then CT Page 2791 five years old, had called 911. The officers responding to the call had been unable to revive Lorraine, when they came to the apartment. Lorraine was transported to the hospital, where she was in serious condition due to a suspected drug overdose, from which she recovered. The police found empty psychotropic pill bottles in the house as well as feces everywhere. The officers determined that the children had been unattended for at least two days. Amanda, the youngest, then nine months old, was dehydrated and lethargic. She was completely covered with feces and was even found to have feces in her mouth. She then weighed only fourteen pounds. Hospital workers reported that Amanda had a severe diaper rash and sores all over her vagina. Blake and Tina appeared medically well, but hungry and Blake had feces all over his feet. Tina reported that she had fed her siblings cereal and milk and that her mother had been asleep for two days. DCF invoked its ninety-six hour hold and placed the children in foster care. On February 6, 1995, DCF again secured an order of temporary custody, this time as to all three children and filed neglect petitions. At that time, in the social study in support of the neglect petitions dated February 27, 1995, the DCF social worker made prophetic comments which remain true to the present time, four years later:
 "Ms. _____ has had fourteen referrals to DCF in the last five years. Throughout this time she has shown little understanding of the seriousness of the allegations against her. She also tends to accept services until the department closes her case, then pulls away from the supports that have been set up for her."
Just two months later, the temporary custody order was continued and reunification efforts ordered by the court. (Sequino, J.). By June, 1995, various services were in place with which Lorraine appeared to be cooperating. The plan was for reunification of the family on August 1, 1995. The children were returned to Lorraine earlier and various in-home services for reunification began, which included a parent educator, services for Lorraine from Milford Mental Health as well as Birth-to-Three services for Blake. Maureen O'Connor, the DCF social worker then in charge of Lorraine's case, testified that there was a complete reunification team with people in the home two or three times a week. The team provided housing, transportation, funding, clothing and food and was available to Lorraine twenty-four hours a day. CT Page 2792
The parent educator assigned to Lorraine testified that she began working with Lorraine in July of 1995. She stated that each session in the home was one to one and a half hours in length, during which time she provided basic education about parenting and effective discipline techniques, as well as support and advocacy for Lorraine. Unfortunately, during these six months, she only had a total of eight visits with Lorraine, citing a lack of consistency on Lorraine's part. And six of those visits occurred in July, August and September, 1995. She had one visit on November 11, 1995 and the last on January 24, 1996. She stated that one of the concerns at that time was Lorraine's difficulty in showing affection with the children and adequately bonding with them. Lorraine also could not effectively set limits for her children. She stated that Lorraine did not meet the goals set for her during the time that they worked together, although there was some improvement. She also stated that for the most part Lorraine seemed motivated and willing to work with her, but that her actions were not in agreement with her perceived attitudes. She did not recall her last visit, but did not believe she noticed anything unusual at that time.
Ms. O'Connor, the DCF case worker, testified that Lorraine needed a lot of assistance with basic life skills, such as meal preparation, baths for the children, setting a schedule for getting up at a certain time and providing meals at a certain time. She stated that by January, 1996, Lorraine was beginning to decline somewhat, as Milford Mental Health and other members of the reunification team were withdrawing their services. Nonetheless, after an in-court review on January 11, 1996, the petitions were withdrawn pursuant to agreement. Ms. O'Connor stated that she met with Lorraine on January 20, 1996 and that Lorraine was overwhelmed with the care of her children. Lorraine spoke to her about not being able to parent her children, but that she did not want another voluntary placement of them with DCF. During these discussions, Ms. O'Connor stated, Lorraine was afraid of what was going on in the apartment house and spoke about people doing things to her.
That Lorraine and her children were not stabilized, despite the withdrawal of the neglect petitions, was confirmed again by January 29, 1996 when Lorraine was psychiatrically hospitalized, the children again removed and an order of temporary custody secured on February 6, 1996. While it is apparent that all involved with Lorraine during this time wished her well and felt that she was attempting to participate in the services she CT Page 2793 required, their wishful thinking could not improve the unfortunate reality of this family's chaotic life. At that time, the neglect petitions which predated the pending termination of parental rights petitions were commenced. While it is clear with the benefit of hindsight that Lorraine, during these five years of DCF involvement, had not managed to learn how to parent her children or to deal with her recurring mental health and drug addiction problems, it is also the case that reunification at more or less all costs was still the philosophy of our national child protection systems, including Connecticut's DCF. Reviewing the mere recital of the many referrals, the reasons for those referrals and Lorraine's responses as well as her grudging and limited use of services makes it glaringly obvious that she did not realize the seriousness of her problems nor the tremendous risk her recurring chronic behaviors presented to her three children. And that review also implicates the child protection system, for it failed to recognize what was plainly in view; that Lorraine A. had demonstrated repeatedly from 1990 to 1996 that she was not able to care for her children and that she regularly placed them at serious risk of harm. As was stated in The Book ofDavid, How Preserving Families Can Cost Children's Lives, Richard J. Gelles, (1996) p. 150, "The reality of current child welfare policy is that the rights of parents are almost always given greater weight than the rights of children." And while recent legislative changes are attempting to address that balance and require that the safety of children be paramount, it is too soon to know how such changes will be implemented in individual cases.[2]
 B. Events since the filing of the Neglect Petitions inFebruary, 1996.
After her emergency psychiatric admission, her third such admission in less than two years, Lorraine remained hospitalized for a period of two weeks and was then in outpatient mental health treatment for a period of time. Ms. O'Connor testified that she met with Lorraine while she was still hospitalized and spoke to her about the children's placements. She stated that Lorraine "was not well, not really about to talk about it, track it or discuss it at all. She was experiencing some psychosis." After her discharge from the hospital, she was again medicated for a period of time. When Ms. O'Connor met with Lorraine next, Lorraine was in her apartment, she was functioning better and her mind was clearer. Nonetheless, Lorraine was still upset with the people in the apartment building, as she thought the building was CT Page 2794 haunted. Less than two months later, in April, 1996, Lorraine was hospitalized again. She had used cocaine and alcohol and called 911 herself. Ms. O'Conner stated that DCF's primary concern with Lorraine then was her need for ongoing mental health treatment. She stated that she spoke to Lorraine about building a therapeutic support team around herself. She explained to Lorraine that this was necessary before reunification with her children could again be discussed. She stated that during her time on the case Lorraine never built such connections and that her ability to relate to DCF deteriorated. The court finds from the evidence that Lorraine has never built such a system of support for herself and the children.
In the months immediately following the placement of the children, Lorraine had supervised visitation with them. The children appeared glad to see their mother during these visits, but their behaviors became more frantic over the course of the visits. The children were very active and Lorraine could not control them. At times, the DCF staff had to intervene and help her. Ms. O'Connor also stated that at each visit Lorraine carefully examined her children for any bruise or mark, a behavior which continues to the present day. Lorraine asked the children repeatedly what had happened to them and regularly made complaints to DCF about the care provided the children by the foster parents. She also discussed with her children her own ailments, so that whatever aliment was described by Lorraine, the children would talk about it and claim to develop the same symptoms immediately. Ms. O'Connor stated that Lorraine's conduct during the supervised visitation sessions in the spring of 1996 did not demonstrate any carryover from the training she had received from the parent educator while the children were in the home or from her work with Milford Mental Health. If anything, such abilities as she had possessed seemed to erode.
1. Sexual Abuse Allegations made by Tina
During the months following her placement, on July 15, 1996, Tina disclosed both to Ms. O'Conner and her foster mother that Heath T. had tried to put his "private in her private." She repeated the same consistent allegations to the Yale Sexual Abuse team, the police detective investigating the allegations and the counselor who worked with her later on at the Clifford Beers Institute. Tina described Heath as a friend of her mother's. The child stated, as Detective Fitzgerald testified, that one time while she was living with her mother, it happened in Tina's room CT Page 2795 and that her mother participated to the extent of undressing her and leaving her with Heath. She stated that while this happened, her mother was in the other room watching TV with her brother and sister. Tina reported she was four when the event took place. Detective Fitzgerald was confident that Tina was reporting an actual event and telling the truth and she began to investigate the matter.
Detective Fitzgerald interviewed Lorraine in October 1996 about the incident. Lorraine denied knowing about it or undressing the child. She reported to the Detective that she "thought something had happened," but she could not relate it in any detail. Detective Fitzgerald testified that Lorraine was more upset about the fact that her daughter thought that she had participated in abuse than about the allegations for the abuse the child had sustained.
In September and October, 1996, even though DCF had not formally curtailed visitation, DFC could never arrange visits and Lorraine did not visit her children for some months. On December 9, 1996, the children were adjudicated uncared-for and expectations entered for Lorraine. At that point, Lorraine's relationship with DFC had broken down. Lorraine apparently realized that her children would not be returned to her in the near future, as had happened so often in the past.
While Lorraine had been instructed both by DCF and Detective Fitzgerald not to discuss the abuse with Tina, she would whisper things into the child's ear and during one visitation session brought a dictionary and began to explain to Tina the difference between the truth and a lie. Some time in the late spring and early summer of 1997, Tina recanted her accusations against Heath and her mother during a counseling session at the Clifford Beers Institute. Detective Fitzgerald again interviewed the child, testifying that she was reluctant to make the child relive the events which took place. During the second interview, Tina again confirmed the abuse. She also stated that Tina reported her mother had told her it was her fault she would be in jail. After this interview, both Heath T. and Lorraine were arrested, Lorraine in June, 1997 on the original charges as well as on a new charge of tampering with a witness.
2. Compliance with Court Expectations and Services Agreements
On December 19, 1996, at the time of the adjudication of all CT Page 2796 three children, the court entered expectations for Lorraine. Among those were to keep her whereabouts known to DCF, not to engage in any criminal activity, to visit her children whenever possible, maintain and secure adequate housing and income, cooperate with the investigation of Tina's allegations and cooperate with all service providers. Some of the most important components, however, from DCF's point of view, were her completion of a substance abuse evaluation, a psychiatric evaluation, participation with therapeutically supervised visitation with her children and following the recommendations of the various evaluators and the clinicians regarding drug and mental health treatment, visitation and parenting.
Lorraine has not maintained adequate housing and income, as she had many different addresses from 1996 to the present. She was homeless for about ten months in 1997 and early 1998. She did not exercise all visitation she was granted and did not visit her children at all from June, 1997 to May, 1998. At the beginning of this one year period, during this time, she was incarcerated for several weeks after her criminal convictions. During much of the balance of the time, she had decided not to visit, a decision Lorraine testified that she now regrets. As will appear in a review of the reports of the evaluations and the clinically supervised visitation sessions, she did not follow recommendations for treatment and parenting. She has maintained her past established pattern of appearing to cooperate for a period of time, but fundamentally not altering her behavior at all.
3. Evaluations
Lorraine participated in a substance abuse evaluation conducted by Eileen Fagan at the APT Foundation in 1997. Ms. Fagan testified at trial that she had great difficulty securing a drug and mental health history from Lorraine, who was angry, hostile and inconsistent in her responses during the course of the interview. Ms. Fagan believed that she was unable to conduct a reliable evaluation because of the lack of a clear history. She observed what she considered to be psychotic behavior on Lorraine's part while Lorraine was in the waiting room prior to the beginning of her appointment. Among her conclusions were that Lorraine's insight and judgment were poor. She also recommended follow up group sessions and continued treatment, in which Lorraine did not participate. CT Page 2797
A court-appointed psychologist evaluated Lorraine on May 13, 1997[3]. Dr. Grant saw Lorraine as well as her three children. The evaluator concluded that Lorraine denied the seriousness of her symptoms. Lorraine was taking psychotropic medications at that time, Cogentin and Trilafon, for the control of psychotic symptoms, primarily hallucinations. In the parent-child interaction, the evaluator concluded that Tina was a parentified child who was highly skilled at managing her siblings. The diagnosis made for Lorraine at this evaluation was of a paranoid personalty disorder with psychotic features. In the evaluator's opinion, Lorraine did not then exhibit a full blown psychosis, but that there were chronic and ongoing problems that would not go away. "There would be periods of time of relative adjustment, followed by periods of time of relative decompensation."[4]
During the interview Lorraine was again observed to have difficulty managing her children.
On April 20, 1998, Lorraine was again evaluated by another court-appointed psychologist, who also observed her with the children. Dr. David Mantell concluded that she showed "strong signs of underlying anxiety, paranoid ideation and confusion." He could not recommend a return of the children to Lorraine as his impression was that she suffered from "a chronic mental disorder that disables her when she is under stress and that prevents her from understanding her own condition and its impact upon her children." Given the lengthy history Lorraine has had with DCF and her numerous parenting failures, the court finds this to accurately describe Lorraine's status and situation.
During his testimony at trial, Dr. Mantell stated that Lorraine's own impaired background of early placements and neglect due to her own mother's mental illness and the death of her mother when Lorraine was still quite young, was linked to her own parenting failures. He stated that her severely disrupted childhood and adolescence led to a "less than adequate understanding of social norms which interferes with her ability to benefit from therapy and to rear her own children." He also noted her "pattern of denial and avoidance of personal responsibility of what had overtaken her and her children." In his opinion, Lorraine has no insight at all into the pattern of behaviors which led to the present situation. The court concludes that Dr. Mantell's assessment was amply demonstrated by Lorraine's subsequent testimony at trial. Dr. Mantell concluded that Lorraine's problems were chronic and had been so for many years. Given all the agencies and therapeutic resources provided CT Page 2798 to her, he found her to be in an "extremely discouraging state that does not suggest that there is likely to be an improvement." He concluded that permanency planning for the children, with whom Lorraine had only an attenuated relationship, was very important. Ultimately, he stated "it is not fair to experiment with their lives to see if she could develop insight and stabilize her life," perhaps not realizing that this is exactly what had happened to the children on numerous occasions since the first confirmations of neglect in 1990.
The last evaluation of Lorraine was performed by Dr. Roy Nissenson, a psychologist, who met with Lorraine at her request. Dr. Nissenson did not receive the same background material the other evaluators received, at Lorraine's request. He was not successful in taking a detailed history from Lorraine. Dr. Nissenson testified at trial that he diagnosed Lorraine as having an adjustment disorder with mixed emotional features and that he did not diagnose her as having a personality disorder. His ultimate recommendation was that the children should not be returned to Lorraine at the present time, but that she should be given an additional six months with adequate therapeutic visitation supports to demonstrate her ability to parent the children. For the reasons set forth below detailing the previous opportunities Lorraine has been given and the length of time that the children have already been in foster care, the court cannot and does not credit this opinion.
4. Supervised Therapeutic Visitation
When the children were first adjudicated uncared-for and committed to the care of DCF on December 19, 1996, among the expectations then set forth was that Lorraine should have supervised visitation with her children in a therapeutic setting where she would be given parenting education and training. Such visitation was provided by Southern Connecticut State University Family Counseling Center where the difficulties that Lorraine had in controlling her children continued. Lorraine was unable to follow the suggestions made to her concerning parenting, did not accept the input of the professionals supervising the visitation and was unable to improve her parenting skills.
As previously found, Lorraine stopped all contact with DCF, was unwilling to cooperate with the services and providers to whom she was referred and stopped visiting her children for approximately ten months, between June of 1997 and until May, CT Page 2799 1998. By May, 1998, the termination petitions had been pending for a period of six months. A hearing on the petitions for the extension of the commitment of the children was held on April 21, 1998 and May 19, 1998. (Jones, J.) At that time, the court heard testimony from Dr. Grant and from the respondent mother, among others. The court found that:
 ". . . it's appropriate for the mother, Lorraine A., to have an opportunity to visit with her children on a regular basis and to have an opportunity to demonstrate to the Commissioner her ability to care for these children."
The court then suggested that Lorraine have a period of six months in which to demonstrate her parenting abilities and directed that DCF was to cooperate with her and assist her upon request with her mental health needs. He also outlined some of the other expectations that had been entered as court expectations on December 19, 1996.
DCF then secured a referral for the children and Lorraine to The Hamden Behavioral Health Services where Lorraine again received services similar to those she had received in the spring of 1997 at Southern Connecticut State University. The supervised visitation sessions began in June, 1998. The last session was on December 18, 1998. When the sessions began in June, the clinician supervising the visits testified, the children were acting out and would not comply with their mother's directions. This pattern continued during the six months of the program. Lorraine herself testified that she did not and would not accept the suggestions and help of the workers at the facility. She did not believe them to be helpful as she was and is convinced she understands how to parent her children. She was hostile to the foster parents, staff and the clinicians. Ms. Harris testified that she could not recommend an end to supervised visitation, based on safety concerns for the children and Lorraine's emotional state. Ms. Harris stated that during the time in question, particularly Amanda and Blake regressed and acted out in their foster homes. She stated that the children were filled with anxiety and that she attributed this to the visitation. From the testimony, the court concludes that Lorraine was unable, with the therapeutic support services provided, to improve her parenting so that even unsupervised visitation could be considered. The court further concludes that she received exactly the type of service and support that Dr. Nissenson recommended for her. Apparently, he did not know when he completed his evaluation, that Lorraine had CT Page 2800 just been the recipient of the very opportunity he recommended she should have. And for the second time in two years, she was unable to learn from this hands-on approach to parenting education.
5. The Children and their Present Status
Lorraine's oldest child, Tina, has been in the care of her present foster mother, Mrs. H., since January, 1996. She has flourished in this home. Her foster mother testified that Tina came to live with her when she was five. At that point, the child had boils on her scalp, a swollen stomach as well as crusts of dirt on her knees and elbows. She stated that Tina was very active and constantly moving about. "She also seemed to be unable to consume food properly." Mrs. H. testified that she discovered that Tina was hoarding food. She also had to teach her not to steal when they went out shopping. Tina at one point told her foster mother that she had been told to steal and sent to the store to do so and then bring items home.
When Tina reported the sexual abuse she suffered, Mrs. H. reported the information to DCF and brought the child to her various investigative appointments at Yale and to the Clifford Beers Institute for counseling. She also reported that the supervised visits with Lorraine were disturbing to Tina. On occasion during visitation, Lorraine would ask Tina to bring her money, which upset Tina. Since the visits resumed in June, 1998, Tina had begun to make negative remarks about her mother. Nonetheless, Mrs. H. reported that Tina has been making steady progress throughout the years and that she is doing well in school. She enjoys visits with her siblings and that she and Tina have a loving relationship. Her foster mother testified that Tina is especially keen on competitive running, where she excels. Mrs. H. wishes to adopt Tina, if she is available for adoption.
Blake and Amanda have been cared for during the last three years by their foster mother, Crystal G. She testified that the children arrived at her home in poor condition and were filthy. She stated that when she first bathed Blake, he drew back and stiffened and it appeared to her that he was not used to taking baths. She also suspected that he may have been hurt or sexually abused. She stated that Blake reported that Heath put something up his "butt". He also reported, prior to Tina's disclosures, that Heath was undressed and in bed with Tina when they still were with their mother. Blake also referred to Heath as his CT Page 2801 father.
Mrs. G. found that Blake and Amanda had constant concerns about food. They were always asking for food. They would take food out of the trash can. At times they would eat off the floor. She stated that both of them needed a lot of attention. Blake, who was then just under three years old, was hard to understand, he really could not talk and was not yet toilet trained. She placed him in a speech program and he continues to receive speech therapy. She also testified that she noted sexualized play with dolls and with other children. Blake, she stated, is getting better. He is now in a regular school placement and his eating habits have improved. Since the visitation resumed, she has found that he is again harder to manage, especially when he returns from visitation. She testified that the children both told her that Lorraine coaches them during the visits and tells them they do not like their foster more and instructs them not to listen to her.
Mrs. G. reported that Amanda was very small and frail when she arrived and she was concerned about her. She, too, exhibited "off-the-wall" behaviors in the beginning. Both children knew no boundaries in the home. Amanda has made progress and is presently in kindergarten. Mrs. G. said the children fit into their family well and are connected to their other children. She and her husband would like to adopt them, if possible.
Dr. Mantell, the court-appointed psychologist, confirmed that the children were doing well in his psychological evaluation. He noted that Blake was close to his foster family and testified that the child "did not think his mother would be able to take care of him." Blake reported that when they were with their mother "we couldn't eat no food there." Dr. Mantell noted Blake had some developmental delays. Tina he found to be a bright child, attached to her foster mother who was affectionate with her. He noted that Tina was distant and avoidant with her biological mother. He also found that Tina had ever decreasing behavioral problems which had disappeared in a number of areas except that Tina still lies and is not remorseful about this behavior. He noted the strong, positive and sustaining relationship between Tina and her foster mother. He also found that all three children required permanence and that they should be adopted in suitable foster homes. He stated that this was in their best interests and that "it would be a major disruption to remove them from their foster homes." CT Page 2802
6. Motion to Dismiss
At the commencement of the trial, the respondent mother filed a motion to dismiss the termination petitions. The motion is premised on the assertion that Lorraine did not receive the visitation and reunification services which were ordered on May 19, 1998. Given the court's review of the testimony and the transcript of the court hearings setting forth the orders, the court cannot agree with this interpretation of the events which took place in 1998. The court concludes that DCF provided Lorraine with a second opportunity to demonstrate her parenting, to benefit from redirection and counseling concerning parenting, and that Lorraine responded in the same manner as she had in the past. She was unable to accept the help she was offered, unable and unwilling to benefit from suggestions made and to use the therapeutic setting to better enable her to parent her children. She once again demonstrated the accuracy of Dr. Mantell's words when he stated that she possessed no insight into her problems.
Respondent mother also claims that the court ordered a hearing take place on December 2, 1998 on the reunification issues and that because that hearing was not held, his client's due process rights were violated. The court notes that the record reflects that no hearing took place in court on the date designated. However, the transcript of the hearing of May 19, 1998 demonstrates the hearing was requested by counsel for the petitioner. The petitioner requested a hearing on whether or not reunification efforts were still appropriate and to enable the petitioner to present evidence of prior acts which had been excluded from the extension hearing. The court fails to see how respondent is prejudiced by the fact that the hearing was not held, as a full trial on the petitions and the respondent's motion was both scheduled for and held on January 11, 1999. The court denies the motion and the relief requested. In view of these findings, the court also denies the alternative request for a continuance.
4. TERMINATION ADJUDICATION
 A. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child CT Page 2803 with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Connecticut General Statutes § 17a-112(c)(1). In this case, the court concludes, from the clear and convincing evidence, that DCF made reasonable efforts to reunite Lorraine with her children. Those efforts continued well past beyond the time it was excruciatingly clear that Lorraine could not and did not benefit from such efforts. The court also finds that since the putative fathers of Blake never participated in any of the proceedings concerning this child nor came forward to claim him, the efforts made to locate them were reasonable.
B. Adjudicatory Findings
In order to prevail in a termination of parental rights case, DCF must also prove by clear and convincing evidence that statutory grounds for termination exist. In re Michael M.,40 Conn. App. 510, 512, ___ A.2d ___ (1998). The statutes provide that the ground must have existed for at least one year unless the court waives the requirement based on the standard set forth for such waiver. Connecticut General Statutes § 17a-112(d). In this adjudicatory phase, the court is limited to the events proceeding the filing of the petition or its latest amendment. Connecticut Practice Book (Rev. 1999) § 33-3(a). In this case, the relevant or adjudicatory date is December 9, 1997.
While other grounds were alleged in the petitions, those grounds were abandoned and at trial DCF proceeded against Lorraine on the allegation of failure to rehabilitation. No dispute exists that the children were adjudicated uncared-for children on December 19, 1996. The remaining provision of the statute requires the court to determine whether the parent has achieved "such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Connecticut General Statutes § 17a-112(c)(3)(C). The court must review the parent's rehabilitative status as it relates to the needs of the child and also determine that such rehabilitation must be foreseeable within a reasonable time. In re Luis C.,210 Conn. 157, 167, 554 A.2d 722 (1989). It does not require that a parent assume full responsibility for a child without the use of available support programs. In re Jessica M., 49 Conn. App. 229,240, 714 A.2d 664 (1998). Because the court is making a prediction as to the future by determining what will or could CT Page 2804 happen within a reasonable time, this portion of the statutory framework must be construed to encompass a parent's conduct both before and after the filing of the termination petitions.
The court finds, by clear and convincing evidence, that DCF has proven that Lorraine had failed to rehabilitate so that she could adequately parent Tina, Amanda or Blake either then, now or at some reasonably foreseeable time in the future. The court has adjudicated these three children as uncared for, as previously found. Given Lorraine's many years of intermittent substance abuse and chronic mental disturbance, the court finds that Lorraine has failed up to the present time to rehabilitate herself, so it would be possible to conclude, within a reasonable period of time, given these children's ages and needs that she could care for them. Dr. Grant noted in 1997 that in Lorraine's life "there would be periods of time of relative adjustment, followed by periods of time of relative decompensation." The court agrees that this is correct and also finds that even during the periods of relative adjustment that Lorraine experienced, she was not able to care for her children. Giving her more time than the nine years that DCF has already been involved in her life demonstrate her rehabilitation would only prolong the uncertainty of placement for the three children.
DCF has alleged that the putative fathers of Blake have abandoned him and that neither has an ongoing parent-child relationship with him. Connecticut General Statutes § 17a-112. The court concludes that there was clear and convincing evidence that neither of the named putative fathers, Heath T. or Antonio H. were ever involved in the life of the child, inquired about him, sent cards, gifts or letters or provided any financial support. Neither ever participated in court proceedings or requested paternity testing to establish paternity. The court concludes that they have each legally abandoned him and that neither had an ongoing parent-child relationship with him.
The court makes no present findings as to the unknown father of Tina and Amanda, given its ruling concerning notice above.
 5. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e): CT Page 2805
1) Appropriate and timely services were provided by DCF, including counseling, parenting education, evaluations, housing assistance, parenting education, therapeutic visitation, transportation assistance, and visitation coordination. The court finds, as stated above, that while at times Lorraine appeared to cooperate with the services, she remained hostile, uncooperative and did not benefit from them to any degree. No services were offered to the putative fathers of Blake as they never came forward to claim this child.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. As previously found, reunification efforts continued for years beyond the time when it was clear Lorraine did not make any lasting changes and improvements in her life to parent the three children. Twice she received supervised visitation with parenting assistance and instruction and each time she failed to benefit from such assistance. She did not secure ongoing mental health treatment, as was required by the court expectations in this matter. The court concludes that DCF more than met its statutory mandate in this case. No reunification efforts were made as to the putative fathers of Blake due to their unavailability.
3) DCF, with the approval of the Court, set reasonable and realistic expectations in order to reunify the family. Lorraine, as previously found was not able to comply or even minimally fulfill those expectations. No expectations were set for the putative fathers of Blake.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. All three children have strong emotional ties with the foster families who, for the past three years, have provided the physical, emotional and educational support these children require. They know their mother and have had a connection to her, but none wish to be returned to her or to live with her. Blake does not have any connection to his putative fathers, although he has identified Heath T. as his father.
5) Finding regarding the ages of the children. Tina is nine years old, Blake just became six years old on February 27, 1999 CT Page 2806 and Amanda will be five on April 26, 1999.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (a) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. While Lorraine has tried in her own view to adjust her circumstances so that the children may be returned to her, such adjustments have not been adequate for her to be able to care for her children. The underlying problems which gave rise to the neglect of the children have not been addressed by her. Nothing is known about the putative fathers' lives.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent No such conduct is noted. DCF has taken many steps to encourage Lorraine to have a meaningful relationship with her children and to rehabilitate herself, which she has been unable to accomplish.
 5. DISPOSITION
Tina, Blake and Amanda have now spent a substantial portion of their childhood in foster care. Each is in need of permanency. It appears likely that the respective foster parents will adopt the children. Their biological mother cannot now care for them nor is it likely that in the reasonably foreseeable future that she will be able to do so. Giving her more time to rehabilitate and leaving these children's placement still undecided is not in their best interests. Tina, Blake and Amanda have thrived in foster care. The court concludes, based on the clear and convincing evidence, that termination is in their best interests. Accordingly, a termination of the parental rights of Lorraine A. to all of her three children is ordered. The court further terminates the parental rights of the putative fathers of Blake; Heath T. and Antonio H. As the rights of Tina and Amanda's unknown biological fathers have not yet been terminated, the court confirms their continued commitment to the care and custody CT Page 2807 of the Commissioner of the Department of Children and Families. The court anticipates, under these circumstances, that upon the termination of their fathers' rights to them, the Commissioner of the Department of Children and Families will be appointed the statutory parent for Tina and Amanda for the purpose of securing adoptive families for them.
The court hereby appoints DCF the statutory parent of Blake. If his foster parents continue to wish to adopt him, the court directs that they be given first consideration. The court further orders that a permanency plan for Blake be submitted within ninety days and that a review plan for him shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session